# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Bankruptcy Case No. 09-36956 |
| Tawfik F. Bittar, | Chapter 7 |
| Debtor. | |
| Patterson Dental Supply Company, Inc., | |
| Plaintiff, | |
| v. | Adversary No. 10-2589 |
| Tawfik F. Bittar, | **MEMORANDUM OPINION** |
| Defendant. | Trial Date: 02/16/2012 |

## APPEARANCES

<u>Attorneys for Plaintiff</u>
Andrew R. Turner, Esquire
Turner Law Firm, L.L.C.
78 South Orange Avenue
P.O. Box 526
South Orange, New Jersey 07079

<u>Attorney for Debtor/Defendant</u>
Philip Kaufman, Esquire
54 Woodbridge Avenue
Highland Park, New Jersey 08904

Procedural background

Patterson Dental Supply Company, Inc. ("Patterson Dental") filed a one-count complaint seeking to exclude its claim from discharge pursuant to 11 U.S.C. § 523(a)(2), (4) or (6).  In an oral opinion issued January 23, 2012, the court dismissed the § 523(a)(2) claim and denied summary judgment on the remaining claims.  The issues for trial were limited to: 1) the value of the collateral at the time of its disposition; and 2) the debtor's intent when he disposed of the collateral.[1]  The court took testimony on February 16, 2012, and reserved decision.  The court issues the following findings of fact and conclusions of law in accordance with 28 U.S.C. § 157.

Findings of fact

Tawfik Bittar is a dental technician who owned and operated Mathew Dental Lab Corp. ("Mathew Dental").  Patterson Dental is in the business of selling and providing financing for dental lab and related equipment. Mathew Dental and Patterson Dental entered into an Installment Sale Contract- Security Agreement ("Agreement"), effective May 26, 2006, for the purchase of certain dental equipment.[2]  The Agreement recited a "time sale price" of $105,850.80 to be paid in 60 monthly installments of $1,764.18.  Mr. Bittar acknowledges that he signed the Agreement and owes the money, but asserts that he did not fully understand the nature of the Agreement.

Mathew Dental later entered into a partnership with Joe Faltaous to form Mathew Rite Smile, LLC ("Rite Smile") and the business, including the equipment that was the subject of the Agreement, was moved to New Brunswick, New Jersey.  Paragraph 5 of the Agreement stated

---

[1] Order Denying Plaintiff's Motion for Summary Judgment and Establishing Issues for Trial [Docket No. 22 ].
[2] Ex. P-1

that: "Buyer shall not remove the Property from the designated location[3] or sell or transfer any interest in the Property without written consent of Seller."  Mr. Bittar acknowledged that he did not obtain the written consent of Patterson Dental authorizing him to move the equipment from New York to New Jersey.  Mr. Bittar contended that Patterson Dental was nonetheless aware that the equipment was moved because Patterson Dental accepted checks with the new address, and also because Patterson Dental continued to service the equipment at the new location.

Mr. Bittar testified that Mr. Faltaous was primarily responsible for the financial management of Rite Smile, while he was primarily responsible for the operation of the equipment. All invoices and statements were sent directly to Mr. Faltaous  Mr. Bittar asserts that during the eleven months they were in business together, Mr. Faltaous continuously misled him by assuring him that all bills were paid.  Eventually, Mr. Bittar discovered that Rite Smile owed approximately $23,000 in taxes and that Mr. Faltaous had not been paying the bills.  Mr. Faltaous and Mr. Bittar dissolved the partnership, and Mr. Bittar assumed responsibility for the entire business.

The business continued to experience financial problems, and Mr. Bittar ultimately agreed to sell the CEREC equipment after his "frame person" James expressed an interest in purchasing it.[4]  Mr. Bittar did not recall James's last name, and there was no written record of the transaction.  Mr. Bittar stated that he received $13,000 from the sale.[5]  From that sum, Mr. Bittar testified that he paid his workers, purchased some materials, and made payments to Patterson Dental.  Mr. Bittar stated that he sold the equipment because he needed money to keep the

---

[3] The address provided for Mathew Dental in the Agreement was in Brooklyn, NY.
[4] Trial transcript at 17.
[5] Trial transcript at 30.

business afloat.  He also testified that he experienced many problems with the equipment and that at the time of the sale the equipment was not working.

Mr. Bittar's testimony regarding how he arrived at the sale price for the equipment was vague and inconsistent.  Mr. Bittar stated that he first asked James for $30,000, not because he thought that was how much the equipment was worth but simply as a starting point for negotiations.  He later testified that he told James that the equipment was $13,000 "take it or leave it".[6]  On cross-examination, Mr. Bittar stated that he looked on E-Bay at the time of the sale and similar equipment was listed for $15,000 - $18,000.   On the issue of value, Patterson Dental offered the testimony of Thomas Caufield, one of its branch managers.  Mr. Caufield testified that he thought the equipment was worth approximately $48,000, but his estimate would be closer to $60,000 if the usage was as little as Mr. Bittar had testified.

After the sale of the equipment, Mr. Bittar made sporadic payments to Patterson Dental totaling $6,000, but he was unable to bring the account current.  Ultimately, Patterson Dental filed suit in the Superior Court of New Jersey for breach of contract. On July 28, 2008, a judgment was entered in favor of Patterson Dental in the amount of $72,626.05.

## Conclusions of law

The fundamental policy underlying the bankruptcy discharge is to provide a fresh start only to "the honest but unfortunate debtor."[7]  To advance that policy, bankruptcy courts are encouraged to strictly construe exceptions to discharge strictly against creditors and in favor of

---

[6] Trial transcript at 36, 55.
[7] In re Jacobs, 381 B.R. 128, 139 (Bankr. E.D. Pa. 2008) (citing Grogan v. Garner, 498 U.S. 279, 286–87 (1991)).

4

debtors.[8] Creditors bear the burden of demonstrating non-dischargeability by a preponderance of the evidence.[9]

**11 U.S.C. § 523(a)(4)**

To prevail on a claim under § 523(a)(4), Paterson Dental must demonstrate by a preponderance of the evidence that its claim resulted from the debtor committing "fraud or defalcation while acting in a fiduciary capacity …."[10] The Order Denying Plaintiff's Motion for Summary Judgment and Establishing Issues for Trial states that the Debtor concedes "the issue of defalcation and conversion of Plaintiff's equipment."[11] That concession satisfies one half of the statutory requirements; section 523(a)(4) also requires that the defalcation occur while the debtor is "acting in a fiduciary capacity." The case law is consistent in noting that the term "fiduciary under § 523(a)(4) is distinct from the concept of a 'fiduciary' under the common law; it is limited to instances involving express or technical trusts. The purported trustee's duties must ... arise independent of any contractual obligation."[12]

The court denied summary judgment on § 523(a)(4) because Paterson Dental failed to identify the precise facts it was relying on to establish the existence of a fiduciary relationship between the parties. From the evidence adduced at trial, it is now clear that the sole basis for an alleged fiduciary relationship is the existence of the security agreement. As the court noted in its oral opinion denying summary judgment, the mere existence of a security agreement does not rise to the level of creating an express or technical trust. Courts have held that "obligations inherent in an ordinary, arm's length commercial relationship, whether such duties are created by

---

[8] Kay Berry, Inc. v. Pearman (In re Pearman), 432 B.R. 495, 500 (Bankr. D.N.J. 2010) (citing In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995)).
[9] Id.
[10] 11 U.S.C. § 523(a)(4).
[11] Docket No. 22
[12] In re Shcolnik, 670 F.3d 624 (5th Cir. 2012) (internal citations omitted).

5

contract, common law, or statue" do not fall within § 523(a)(4).[13] For example, in Mitsubishi Motor Sales of Caribbean, Inc. v. Ortiz,[14] a debtor sold cars in violation of its floor plan financing agreement. The Mitsubishi court held that the debtor's sales out of trust did not give rise to a cause of action under § 523(a)(4) because the financing arrangement did not create a trust relationship with the secured creditor. Unsurprisingly, there are numerous reported opinions involving a debtor who failed to pay a creditor after selling the creditor's collateral. Conversely, the court is unaware of a single decision finding that a failure to pay a creditor according to a security agreement is a violation of a fiduciary duty.[15] As the Coley court noted: "the § 523(a)(4) discharge exception is not designed to apply to debts arising from ordinary commercial or contractual relationships."[16] Accordingly, the court finds in favor of Mr. Bittar on the § 523(a)(4) cause of action.

**11 U.S.C. §523(a)(6)**

Section 523(a)(6) prevents discharge of debts arising from a "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Authorities have interpreted the operative language in § 523(a)(6) as embodying two distinct requirements: "willful" and "malicious".[17] In order to succeed, Patterson Dental must establish both prongs.

---

[13] In re Kohler, 255 B.R. 666, 667-68 (Bankr. E.D. Pa. 2000).
[14] 418 B.R. 11 (D.P.R. 2009).
[15] *See, e.g.,* In re Coley, 433 B.R. 476 (Bankr. E.D. Pa. 2010).
[16] Id. at 496.
[17] Alan N. Resnick & Henry J. Sommer, 4 COLLIER ON BANKRUPTCY ¶ 523.12[2] (16th ed. 2009); In re Fechnay, 425 B.R. 212 (Bankr. E.D. Pa. 2010).

In applying § 523(a)(6), courts have interpreted "willful" to mean "voluntary and deliberate."[18] The Supreme Court has clarified that the "willful" prong of 523(a)(6) "requires a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[19] Prior to that clarification, many cases found that conversion of property subject to a perfected security interest constitutes willful and malicious injury to property under 11 U.S.C. § 523(a)(6).[20] Since then, most courts have taken a more nuanced approach.[21] This court is persuaded by the rationale of those courts that have concluded that a conversion of collateral may be willful and malicious, but that determination is fact specific and depends on the totality of the circumstances, including "the terms of the agreement and the debtor's reason for misuse of the proceeds of collateral, while also considering the actions of the creditor."[22]

Here, the totality of the circumstances compel the conclusion that Mr. Bittar did not act with deliberate intent to injure Patterson Dental when he sold the collateral. Following the approach of the Lovvorn court, the court first looks to the terms of the agreement. This is a crucial starting point because, as the court noted in its ruling on summary judgment, if the debtor did not understand the nature of a security agreement it would be difficult to find that he intentionally violated it.[23] The Agreement at issue here is titled "Installment Sale Contract-Security Agreement", but the front page of the document is devoid of any reference to the

---

[18] In re Aaroe, 2011 WL 2886312 (Bankr. D.N.J. July 14, 2011) (quoting Kay Berry, Inc. v. Pearman (In re Pearman), 432 B.R. 495, 500 (Bankr. D.N.J. 2010).
[19] Kawaauhau v.. Geiger, 523 U.S. 57, 61 (1998).
[20] See, e.g., First Nat'l Bank v. Stanley (In re Stanley), 66 F.3d 664, 668 (4th Cir. 1995).
[21] In re Wooten, 423 B.R. 108 (Bankr. E.D. Va. 2010) ("Cases subsequent to Geiger that have considered whether acts of conversion constitute willful and malicious injury focus on the distinction between whether the conversion was an intentional one or merely a reckless or negligent conversion of property.").
[22] In re Lovvorn, 430 B.R. 318, 328 (Bankr. M.D. Ga. 2010).
[23] Wooten (quoting In re Nelson, 67 B.R. 491, 497 (Bankr. D. Minn. 1985) ("malicious intent must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights.").

meaning of a security agreement or language explaining that the equipment being sold was simultaneously being pledged as collateral for the loan of the purchase price. The legal significance of a purchase money security interest is beyond the common knowledge of most dental technicians. The first reference to the security interest aspect of the agreement appears in the fine print on what appears to be page three of the agreement.[24] Paragraph 5 states that the "Buyer hereby grants to Seller a security interest in the Property …." Line 12 of paragraph 5 states that the "Buyer shall not … sell or transfer any interest in the Property without written consent of the Seller." Mr. Bittar was not represented by an attorney when he entered into the Agreement. He also testified that when he sold the property he was not thinking about the terms of the Agreement.

In Wooten,[25] the court considered a similar factual scenario. The debtor in Wooten contended that he had not read the security agreement and that he was unaware that the property he sold was the creditor's collateral. The court found that unpersuasive based on several factors: 1) the debtor was an experienced businessman; 2) a witness credibly testified that he had discussed with the debtor the extent of the liens at the time he signed the agreement; and 3) the debtor had initialed every page of the security agreement, including the page containing the grant of the security interest on all of the assets of the business. These facts are the polar opposite of what was presented at trial in this case. Mr. Bittar did not come across as a knowledgeable businessman in the area of financing. That conclusion is supported by the fact that Mr. Bittar allowed Mr. Faltaous to handle all of the business aspects of their partnership when they formed Rite Smile, and that it took him almost a year to realize that Mr. Faltaous was not paying the

---

[24] The copy of the Agreement that was provided to the court, and admitted into evidence as D-1, is missing a page. The second page of the Agreement that was provided begins with paragraph 5, and there are no paragraphs 1 – 4.
[25] In re Wooten, 423 B.R. 108 (Bankr. E.D. Va. 2010).

taxes or any of the bills.  Next, none of the presented evidence suggested that Patterson Dental explained in layman's terms any of the fine print in the Agreement.  Finally, the debtor did not initial the page of the Agreement that contained the security agreement language.  All of those factors support the conclusion that Mr. Bittar was unaware that he was acting in contravention of the terms of his Agreement with Patterson Dental when he sold the dental equipment.

The next aspect the Lovvern test instructs the court to look at is "the debtor's reason for misuse of the proceeds of collateral".[26]  Mr. Bittar convincingly testified that the reason he misused the proceeds of the sale of the collateral was that he was desperate to keep his business afloat.  The trial transcript is replete with supportive statements.  When asked about the reason he sold the equipment Mr. Bittar responded:  "I sell it to the frame person because the situation, financial situation to keep the business running and to keep my worker also food on his table and my decision that time is if it's correct or wrong, I take this decision to keep the business running ...."[27]  In a similar vein, Mr. Bittar later testified: "Also, now I know I did mistake.  I apologize, but in dark situation I … think I did the best thing for the business."[28]  When asked if he knew that the sale was "wrong with regard to your agreement with Patterson", Mr. Bittar responded: "After that I, I know that wrong, after all the problem come to me, but that time even you cannot think, you know.  You need something to keeping business running …."[29]  The testimony does not support the conclusion that Mr. Bittar was a calculating man who was selling the equipment with full knowledge that he was violating the terms of his security agreement and intending to cause financial harm to Patterson Dental.  The testimony supports a finding that his intent at the time of the sale was simply to keep the business running as best he knew how.  When later asked

---

[26] 430 B.R. at 328.
[27] Trial transcript at 27 (sic).
[28] Trial transcript at 39 (sic).
[29] Id.

on cross-examination about whether he intended to stay in business and repay his debt to Patterson Dental, Mr. Bittar replied affirmatively.[30]

Another significant factor is that Mr. Bittar used a substantial portion of the proceeds of the sale of the collateral to pay Patterson Dental.  Of the $13,000 Mr. Bittar reports receiving from the sale, he paid $6,000 to Patterson Dental.  That is the single strongest piece of evidence regarding Mr. Bittar's intent.   In his summation, Patterson Dental's counsel made the cogent point that in other transactions, such as the sale of the business to the Moores[31] in October 2008, Mr. Bittar sought the advice of counsel, but in the sale to James he did not.  Counsel asks the court to conclude from that fact that Mr. Bittar knew that his actions were improper but proceeded with the intent to deprive Patterson Dental of the opportunity to reclaim its equipment.  That argument would have more persuasive force if Mr. Bittar did in fact abscond with the funds; but he did not.  He continued to try to run the business and he continued to make payments to Patterson Dental.

The totality of the circumstances in this case convince the court that Mr. Bittar did not act willfully, within the meaning of § 523(a)(6), when he sold the equipment.

Given the court's finding that Patterson Dental has not established the "willful" prong of 523(a)(6), the court does not need to also consider the "malicious" prong.  It also need not consider the value of the collateral.

<u>Conclusion</u>

 For the foregoing reasons, the court finds that Patterson Dental has not sustained its burden of establishing a cause of action under either §523(a)(4) or (a)(6). Judgment will be

---

[30] Trial transcript at 65-66.
[31] Ex. P-2

entered in favor of Mr. Bittar.  Counsel for Mr. Bittar should submit a form of order in accordance with this opinion.

>                    */s/ Kathryn C. Ferguson*
>                    KATHRYN C. FERGUSON
>                    U.S. Bankruptcy Judge

Date:   May 8, 2012